Filed 3/25/24  P. v. Welch CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> KENNETH SCOTT WELCH, <br><br> Defendant and Appellant. | D082220 <br><br><br> (Super. Ct. No. FVI17000756) |


APPEAL from a judgment of the Superior Court of San Bernadino County, Debra Harris, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

Kenneth Scott Welch went on a three-day crime spree during which he fatally shot a man from his car, shot two other individuals in their vehicles while driving, robbed a gas station convenience store, and shot a deputy

sheriff. Prior to trial, Welch pled guilty to two counts of being a felon in possession of a firearm (Pen. Code,[1] § 29800, subd. (a)(1); counts 6 & 7). A jury convicted him of first degree murder (§ 187, subd. (a); count 1), attempted murder (§§ 664, 187, subd. (a); count 2), two counts of shooting at an occupied motor vehicle (§ 246; counts 3 and 4), and second degree robbery (§ 211; count 5). With respect to count 1, the jury found true the special allegation that the murder was intentional and perpetrated by discharging a firearm from a motor vehicle with the intent to inflict death (§ 190, subd. (a)(21)). On counts 1 through 4, the jury also found **true** that Welch intentionally and personally discharged a firearm causing death or great bodily injury (§ 12022.53, subd. (d); counts 1-4). Finally, as to count 2, the jury found true the special allegations that Welch acted willfully, deliberately, and with premeditation in the commission of the attempted murder and that said crime was directed at a peace officer.

The trial court sentenced Welch to an aggregate sentence of life without the possibility of parole, an indeterminate term of 115 years to life, and a determinate term of 11 years, consisting of the following: (1) life without the possibility of parole on count 1; (2) 15 years to life on count 2; (3) seven years on count 3; (4) one year and eight months on count 4; (5) one year on count 5; (6) eight months each for counts 6 and 7; and (7) 25 years to life for each of the four firearm enhancement allegation. The trial court also imposed various fines and fees.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

Welch asserts seven contentions of error on appeal.[2]  Specifically, he argues:  (1) the trial court abused its discretion in denying his mistrial motion; (2) the trial court erred by failing to instruct on the lesser included offense of voluntary manslaughter based on heat of passion; (3) the prosecution committed misconduct by inquiring about an appellate opinion given to Welch by his attorney that he then discussed with his mother on the telephone; (4) section 190.2, subdivision (a)(21) is unconstitutionally overbroad on its face and as applied in this case; (5) section 190.2, subdivision (a)(21) is unconstitutionally vague; (6) the trial court erred by not dismissing three of the four section 12022.53, subdivision (d) enhancements pursuant to section 1385, subdivision (c)(2)(B); and (7) if we find he forfeited claims 3 or 6, we must alternatively find his trial counsel provided ineffective assistance.

We conclude the trial court did not err and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

Prosecution

A. *March 14, 2017 Freeway Shootings*

1.  Count 3

On the evening of March 14, 2017, Victor H. was driving his Chevy Silverado truck on the 210 freeway from Fontana to San Bernadino.  Traffic slowed, and a dark car pulled up even with his truck in the lane to his left. The driver, who Victor described as "a white person" with some beard growth, stretched his right arm out and pointed a handgun at Victor through the

---

[2]    Welch also challenged a parole revocation fine in his opening brief, but he subsequently conceded there was no error in the trial court's imposition of the fine and withdrew the argument.

lowered passenger window.  The man then started shooting, breaking Victor's driver's side window six or seven times.  Bullets also passed through Victor's left forearm and grazed his abdomen.  Victor pulled off the freeway and eventually was taken to a hospital where he was treated for about three hours and then released.

2.  Count 4

On the same evening, Rosa Z., her friend Laura V., and her boyfriend, Alberto G., were driving back to California from Arizona on the 210 freeway.  Rosa was driving, Laura was in the front passenger seat, and Alberto was in the rear passenger seat.  Suddenly, Alberto's phone, which had been sitting on the rear passenger door armrest, "exploded."  A few seconds later, Alberto said, "I think I got shot" and then pointed to a car and said, "It was that car.  So step on it."

Rosa sped up and the other car moved to her left and pulled up next to her.  She described the car as dark with paper license plates and said the driver was a white male who was wearing glasses.  The driver pulled out a handgun and pointed it at them, and Rosa immediately slammed on her brakes.  The other car kept driving and exited the freeway.  Rosa believed the driver shot at them several times.

Laura called 911, and they pulled to the side of the road.  Rosa saw that a bullet had passed through Alberto's upper right thigh.  As a result of his injuries, Alberto was out of work for two years.

B.  *March 15, 2017 Murder (Count 1)*

Valerie H. lived in San Bernadino with her three children, their father, and his uncle, Mario F.  On the morning of March 15, 2017, Mario drove his nephew to work in Rialto.  Valerie and her eighteen-month-old son rode along.  After dropping off his nephew, Mario took the 210 freeway and then

exited to head toward home. As they approached their apartment complex, Valerie noticed that her uncle[3] passed the first gate to their building and said, "Oh, you're going to pass it." In response, Mario told her, "I think we are getting followed or something."

They looped around the block and returned to the entrance to their complex, at which point Mario pulled over to the right side of the road. The dark car that was following them pulled up behind Mario's car.

Mario told Valerie he was going to see what the person in the dark car wanted and then got out and walked back toward the other car. According to Valerie, Mario did not have a weapon and was not holding anything. The dark car pulled forward toward him and, as Valerie watched through the back window, she saw the driver of the car that was less than 15 feet from her reach behind the seat and grab something.

After the car pulled up next to Mario, Valerie saw him look down through the car's front passenger side window. She knew her uncle was upset that they were being followed but said Mario did not say anything to the driver. She also did not see the driver say anything to him and said she did not believe there was enough time for them to exchange any words. Seconds later, she heard a gunshot and saw Mario fly back and fall to the ground. The driver then drove away.[4]

---

[3]     Valerie also referred to Mario as her uncle.

[4]     After refreshing her recollection by reviewing her 2017 statement to police, Valerie said she remembered telling a detective her uncle probably asked the driver if he needed something, but she did not hear the conversation and could not tell if they spoke. She reiterated that "[i]t was just so fast."

Valerie carried her son over and touched Mario's chest to check for a heartbeat. She then tried to walk to the opposite side of the street but said she could not feel her legs and had to crawl over to the curb with her son on her hip. She later provided the police with a description and partial license plate number.

Meanwhile, R.H. was standing just inside her front door across the street and was looking out the window when Mario pulled up followed by the other car. She saw a man get out of the first car and walk quickly toward the other car behind him. She said he did not have anything in his hands. As he approached the other car, R.H. thought the man might have put his arms up as if to say, "what's up, or what's going on," but she was not sure. She also did not know for certain if they talked to each other because she was on the telephone at the time. However, she said it did not seem like they were fighting. She then heard a gunshot and saw the man fall. She described the whole incident as having happened "so fast" and said the time from when the man went to the car to when she heard the gunshot was "almost immediately."

R.H. confirmed that the other car pulled away right afterward. A woman then got out of the front car with a child and hopped in a red car that had pulled up. She said they drove away but then came right back.

C. *March 16, 2017 Robbery (Count 5) and Attempted Murder (Count 2)*

Several days prior to the robbery and shooting charged in counts 2 and 5, the manager of a Chevron gas station recalled seeing Welch purchasing sodas and flirting with a cashier. Welch tried several times to pay with his credit card, but it did not work, so eventually another customer paid for the items.

On March 15, 2017, Welch came to the store to buy cigarettes and paid cash. He returned just before midnight and requested to purchase a vape device, vape batteries, vape juice, and a phone charging cable. After the attendant placed the items on the counter, Welch took them and started to walk away. The attendant told him he had to pay, to which Welch responded, "No. I don't pay nothing." The attendant asked him repeatedly to return the items or pay for them, but Welch refused, tried to hit him, and then walked away, at which point the attendant said he was going to call the police. Before leaving, Welch responded, "Fuck you and fuck the police" and warned "I'm going to come back for you." The attendant saw Welch get into a black Chrysler and leave.

He then called 911 and Deputy Higgins responded. The attendant explained what had happened and showed the officer the video.[5] After the deputy left, the black Chrysler returned and parked in front of the entrance. The attendant pressed the emergency button. Another employee, who was standing outside, told Welch he could not go back into the store. Welch said, "I want to pay for stuff," to which the employee responded, "We already . . . called the police. We can't accept nothing that you want to bring back."

Shortly thereafter, Deputy Higgins returned and parked behind the Chrysler. The deputy got out of his vehicle and told the other employee to go inside. He then drew his firearm, identified himself, engaged the audio recording device on his belt, and commanded Welch to exit his vehicle.

As he approached the vehicle, Deputy Higgins thought he might have the wrong person and holstered his gun to deescalate the situation. However,

---

[5] The Chevron station contained over 30 cameras and most of the events were captured on video and shown to the police and jury.

7

when he began communicating with Welch, Deputy Higgins described him as "[e]xtremely agitated" and ended up spraying him with pepper spray. Welch responded by shooting Deputy Higgins in the lower left chest. Because the deputy was wearing a protective vest, he sustained only soft tissue damage and bruising to his left lung.

Deputy Higgins returned fire as he backed toward his vehicle to take cover. Welch continued to shoot at him, with bullets coming within inches of the deputy. After Welch drove away from the scene, Deputy Higgins attempted to pursue him but was unable to locate Welch's vehicle.

D. *The Arrest and Investigation*

Welch was arrested while walking his dog near his home. Officers discovered a semiautomatic handgun loaded with 9mm caliber bullets tucked into the back of his pants, under his shirt. They located Welch's gray Chrysler sedan with a temporary license plate parked next to his residence behind a wooden gate. A tarp covered the rear window of the car, which had been shattered, and there was a bullet hole near the rear license plate.

Welch admitted to shooting at Victor and described the truck he had fired upon as a black Chevy with an Oakland Raiders sticker on the back. A detective who inspected Victor's truck testified that the tow hitch did look somewhat like a Raiders emblem from a distance. Welch also admitted shooting at a car prior to shooting at Victor's truck. During a separate interview, he admitted to shooting Mario in the head. He further admitted to other detectives that he took items from the Chevron station without paying for them and shot at Deputy Higgins.

During one of the interviews, Welch asked to call his mother. Welch spoke to both of his parents on speaker phone in the detective's presence and

8

the call was recorded. During the call, he told his parents he was responsible for all of the shootings.

A criminalist with the San Bernardino County Sheriff's Department testified that bullet casings recovered from the gas station and the scene of Mario's murder were fired from Welch's gun.

II.

Defense

A. *Welch's Mother*

Welch's mother testified that on Welch's birthday in January she and his father took him out to dinner and told him they could no longer pay for the mobile home he had been living in. She described his reaction as stoic.

The weekend before he was arrested, she said Welch called at 1:00 p.m. to say he was coming to visit their home, which was about four hours away. She explained that he arrived much later than expected and seemed "off," "a little angry, a little abrupt, a little jittery." He returned home the next day and, the following Monday, he called them at 2:30 o'clock in the morning and seemed "lost" and like he needed his parents.

B. *Welch*

Welch then testified in his own defense and acknowledged having told his mother that he believed telling the truth was the right thing to do. He explained that he had been under the influence of methamphetamine and marijuana during the law enforcement interviews, had first used methamphetamine when he was 14 years old, and had been using methamphetamine intravenously every day since September or October 2016. He acknowledged that it made him paranoid and led him to believe people were sneaking into his house and following him.

9

On the night of the first shootings, he said he was on the road and armed because the tracking system for his parents' phones made him think they had been kidnapped and he went to go find them. He left with a 10-round magazine loaded in his gun. As he was driving on the 210 freeway, he said the passenger of a brown car made a gun sign out the window with his fingers. Something told him to shoot the car, so he shot it. He then pulled off the freeway and got on going the other direction.

When he got back on the freeway, he thought a man in a truck (Victor) was chasing a woman in a car, so he shot into the truck to protect the woman. He then went to church before going home. He also reloaded his gun before heading out the next day.

Welch said at the time of Mario's shooting, he thought everyone driving around him knew him. When Mario turned his turn signal on and changed lanes, Welch thought Mario was trying to lead him off the freeway and wanted Welch to follow him. After both cars stopped, he said Mario came back to his car with something in his hand and leaned down by the passenger window, at which point Welch asked him, "Do you know who I am?" He said Mario responded, "Do you know who I am?" Welch said "No" and then pulled out his gun. He claimed he felt threatened and in fear for his life because Mario was acting aggravated and angry. Welch testified that when he pointed his gun at Mario, Mario laughed at him and "one of his arms disappeared." Welch thought Mario was going to get into his car or take his gun from him, so he shot him. He then went home and again reloaded his gun.

Welch described the first time he went to the Chevron station and said that while he was trying to swipe his payment card, someone came up and grabbed a card that was stuck in the chip slider at the bottom. After that, he

10

got paranoid and thought someone was able to drain his accounts. He said he was "having auditory hallucinations really bad" the night he kept returning to the Chevron[6] and thought he heard messages on the radio about what to do and where to go. As he walked out after buying cigarettes, he passed a woman walking in and got the impression something bad was going to happen to the woman in the store. He left, but then came right back and went into the store as she was leaving. At that point, he admitted having walked out with the vape supplies.

After driving away again, he said he returned because he felt bad and wanted to pay for the merchandise he took. He also thought a black car was leading him there. When he arrived, he told a store clerk he wanted to pay for the things but was told they had already called the police. When he heard the deputy speak, he got back in his car because the officer had his gun drawn. He said he thought it was a fake police officer because he did not think there were police on the streets anymore.

Welch testified that he told the deputy to put his weapon away, which the officer did. However, the deputy then sprayed him with pepper spray. He said he then pulled out his pistol and shot the deputy in the chest. The deputy ducked down behind his vehicle and returned fire. Welch shot at the officer's front windshield and light to keep him undercover so Welch could drive away. As he was backing out, he said he was shot in the back but that the bullet did not penetrate.

---

6    Later he claimed to have suffered auditory hallucinations "all the time" since his early 20s and indicated his mother had him involuntarily committed for three days at one point.

11

When he got home, Welch said he parked his car behind the gate he had recently built and then went in and went to sleep. When he woke up and took his dog outside, officers arrested him.

On cross-examination, Welch admitted he did not mention during any of the police interrogations that he was hallucinating, that he thought his parents had been kidnapped, or that he was hearing voices instructing him from the radio.

C.    *Licensed Clinical Psychologist*

Laurel Mattos, a clinical psychologist, testified that she met with Welch for a total of four hours in January 2022 and provided a mental health evaluation. She diagnosed him with a stimulant use disorder (referring to the methamphetamine use), a cannabis use disorder, and an alcohol use disorder. Additionally, she diagnosed him as having an "unspecified schizophrenia spectrum for other psychotic disorder."

D.    *Forensic Toxicologist*

A forensic toxicologist testified that methamphetamine was a central nervous system stimulant that can cause paranoia, hallucinations, and aggressive and violent behavior when used over a prolonged period or at high doses. Based on a blood sample she tested that was taken from Welch on the day of his arrest, the forensic toxicologist testified that he had methamphetamine in his system and had used the drug no more than 24 hours prior to the blood draw.

## III.

## Stipulations

The parties stipulated that law enforcement recovered drug paraphernalia, a small container of marijuana, and 0.35 grams of methamphetamine from Welch's home. They also stipulated that records

from Loma Linda University Behavior Medical Center showed that Welch was admitted there as an inpatient from February 28, 2013, to March 2, 2013, pursuant to Welfare and Institutions Code section 5150 due to altered thoughts and because he was a danger to others. The records further showed that Welch was diagnosed with substance-induced psychotic disorder, substance-induced mood disorder, alcohol dependence, methamphetamine dependence and Attention Deficit/Hyperactivity Disorder.

## DISCUSSION

### I.

### Welch's Mistrial Motion

Welch contends the trial court abused its discretion by denying his motion for a mistrial. Specifically, he argues a mistrial was warranted because the prosecutor failed to properly disclose exculpatory evidence relevant to Welch's defense in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and section 1054.1.

A. *Additional Facts*

After trial commenced, the prosecution disclosed additional evidence to the defense. In response, defense counsel filed a motion for a mistrial arguing the prosecution had suppressed potentially exculpatory evidence and had not produced evidence regarding the moral turpitude and impeachment of potential witnesses. As relevant here, the motion specifically alleged the prosecutor failed to disclose: (1) Mario's autopsy protocol from 2017, which included a toxicology screen showing he had methamphetamine in his system at the time of his death; (2) the coroner's investigative report showing Mario's correct middle name and contact information for his relatives; (3) Mario's

13

criminal history; and 4) the fact that Valerie had an active warrant for her arrest at the time of the trial.[7]

At the hearing on the motion, defense counsel argued the toxicology screen conducted during Mario's autopsy supported Welch's claim that Mario was acting in an aggressive manner prior to the shooting. She claimed that earlier disclosure of the report would have allowed counsel to obtain an expert on the effects of methamphetamine. With respect to the coroner's report reflecting Mario's correct middle name, counsel reasoned that earlier disclosure of the report would have helped her locate his criminal history, which also could have led to the discovery of evidence showing he was an aggressive individual. As to Valerie's arrest warrant, counsel said she could have cross-examined Valerie more effectively had she been aware of this basis for questioning Valerie's credibility.

In response, the prosecutor maintained that the presence of methamphetamine in Mario's system was not relevant because there was no evidence that Mario provoked Welch. The prosecutor also asserted that he had disclosed all moral turpitude evidence regarding the testifying witnesses prior to trial.

During the mistrial motion hearing, the prosecutor provided defense counsel with Mario's rap sheet. The rap sheet reflected that over 25 years prior to his murder, Mario was convicted of receiving stolen property and first

_____

[7]     Although the mistrial motion alleged five other purported discovery violations, which Welch lists in his opening brief, he does not base his challenge to the ruling on the mistrial motion on these allegations so we do not address them.

14

degree burglary, and, that he was convicted of second degree burglary over 20 years prior to his death[8].

The trial court denied the motion for mistrial, stating that it did not see how the delayed disclosures "eviscerated [the] defense." Defense counsel responded that she could not predict what evidence might have been available had the evidence been disclosed earlier. The court noted that defense counsel could call Valerie back to the stand. It also advised counsel that now that Mario's criminal history and positive test for methamphetamine use were available to her, she should plan to call an expert to testify as to the possible effects of methamphetamine on a person. The prosecutor reminded the court that defense counsel had already indicated she intended to call a toxicologist to testify about Welch's methamphetamine use, and thus, the same witness could testify about the methamphetamine noted in Mario's toxicology screen.

B. *Legal Principles*

" 'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged.' " (*People v. Clark* (2011) 52 Cal.4th 856, 990; *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.) Determining whether a particular incident resulted in prejudice that is " 'incurable by admonition or instruction' " (*People v. Collins* (2010) 49 Cal.4th 175, 198) "requires a nuanced, fact-based analysis," which is best performed by the trial court. (*People v. Chatman* (2006) 38 Cal.4th 344, 369–370.) We review a trial court's order denying a motion for mistrial under the abuse of discretion standard. (*Clark*, at p. 990.)

---

8       Mario was acquitted of robbery and petty theft during this proceeding.

15

C.    *Analysis*

Under *Brady*, *supra*, 373 U.S. 83, and its progeny, "the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence. The duty extends to evidence known to others acting on the prosecution's behalf, including the police." (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 709.)

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282 (*Strickler*).) "Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).)

On appeal, it is the appellant's burden to show a *Brady* violation. (*Strickler*, *supra*, 527 U.S. at p. 289.) We independently review the record in determining whether there was a *Brady* violation but, in so doing, give great weight to trial court findings of fact that are supported by substantial evidence. (*People v. Masters* (2016) 62 Cal.4th 1019, 1067.)

In this case, there is a significant question as to whether the prosecution can be said to have suppressed evidence it was obligated to disclose. But even assuming it did, Welch has not demonstrated that the

16

belatedly disclosed evidence was material to the issue of his guilt or innocence.

Welch contends all the evidence was material to establish the defense theory that Mario was the aggressor in the encounter with Welch and that Welch responded spontaneously in either a reasonable or unreasonable belief in the need to defend himself. But as it stood, the evidence did not show that Mario was the aggressor. R.H. could see Mario's whole body and testified that he did not have anything in his hands, did not seem to be fighting with Welch, and, if anything, had just approached Welch's car with his hands up as if to say "what's up, or what's going on." There was no evidence or suggestion that R.H., who simply lived across the street and happened to observe the murder, knew any of the individuals involved or had any incentive to be untruthful. Moreover, although Welch claimed Mario was aggressive, he acknowledged during a police interrogation that it was Mario's act of laughing at him, not his allegedly aggressive behavior, that made him "snap" and shoot him:

> "Welch: Yeah, he laughed when I pulled my gun and I was like I was going to do it and then I pulled it back, and I was like 'no' I was going to stop, you know I wasn't going to do it. I was going to-
>
> "Det. Chambers: But when he laughed it made you like want to do it?
>
> "Welch: (Laughter.) Yeah.
>
> "Det. Stafford: Basically.
>
> "Welch: Yeah, yeah. That's when I did it."

In other words, by his own admission, Welch did not shoot Mario as "a reflexive response to [Mario's] threatening and aggressive approach toward [him]" as he claims in his reply brief. Instead, he acknowledged that

17

he stopped and reconsidered after Mario's approach. He then changed his mind and shot Mario because he was upset that Mario laughed at him. He further belied any suggestion that fear based on Mario's aggressive behavior motivated the shooting by telling detectives he shot Mario "[b]ecause something was telling me to." Likewise, although he told detectives that Mario had something in his hand, when one of them asked him "did he ever threaten you with it?" Welch said, "No."

Valerie likewise testified that, although she knew her uncle was upset that they were being followed, she did not believe he said anything to Welch. Also, like R.H., she said the whole thing happened very quickly, and she testified that she did not think there was even enough time for them to have exchanged words.

Welch has not shown that, had the prosecution timely disclosed the challenged evidence, there was a reasonable probability of a different result. Welch argues that if Valerie's credibility had been impeached, it would have affected the outcome because she was the sole percipient witness who disputed Welch's version of events. But that is not the case. As just explained, R.H. also did not observe any threatening conduct by Mario. And, to a large extent, Welch himself refuted his own self-defense theory. Thus, even if defense counsel had impeached Valerie's credibility, it was not reasonably probable the jury would have believed Welch's self-serving claim of fear in the face of R.H.'s testimony and Welch's own interview statements.

Likewise, Mario's convictions for nonviolent felonies over 20 years ago did not support a finding that he acted aggressively. The fact that he was charged with the violent felony of robbery 20 years earlier also did not support such a finding given that Mario was acquitted of that crime. Nor would a showing that he had methamphetamine in his system support a

18

finding of aggressiveness, absent an explanation of how the drug could have negatively impacted him. Although we may consider whether the prosecutor's failure had an adverse effect on the defense's presentation of their case (*In re Brown* (1998) 17 Cal.4th 873, 887), in this instance the late disclosure does not appear to have impacted Welch's opportunity to present the necessary expert testimony to support his theory. The court gave counsel an opportunity to offer such testimony and, given that counsel had already arranged for a toxicologist to testify as to the effects of methamphetamine on Welch, counsel could have elicited the toxicologist's testimony with regard to Mario. She chose not to, for whatever strategic reason, and thus, the presence of methamphetamine in Mario's system demonstrated little.

Finally, the defense's contention that timely disclosure of the coroner's report listing his correct middle name would have allowed counsel to contact family members regarding whether Mario had a propensity for aggression provides nothing more than speculation as to what further investigation might have uncovered. As previously noted, a claim that the evidence *might* have changed the trial's outcome does not rise to the level of demonstrating a *reasonable probability* of a different result. (*Salazar*, *supra*, 35 Cal.4th at p. 1043.)

Ultimately, the materiality inquiry is whether " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " (*Strickler*, *supra*, 527 U.S. at p. 290.) Even considering the late disclosed evidence as a whole, as we must, Welch has not met his burden. Accordingly, we find no *Brady* violation.

For similar reasons, we reject Welch's contention that the prosecution violated section 1054.1, which requires the prosecutor to disclose, among other things, "[a]ll relevant real evidence seized or obtained as a part of the

19

investigation of the offenses charged" that is "in the possession of the prosecuting attorney" or known by the prosecuting attorney "to be in the possession of the investigating agencies." (§ 1054.1, subd. (c).) Even if Welch demonstrated a violation of section 1054.1, a trial court's ruling on a violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Verdugo* (2010) 50 Cal.4th 263, 280.) Under *Watson*, an error is prejudicial only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.) As we have already determined that there is not a reasonable probability of a different result, we conclude that any section 1054.1 error by the prosecution was harmless.

Having found the prosecution's late disclosures did not violate *Brady* and that any violation of section 1054.1 was harmless, we conclude the trial court did not abuse its discretion in denying the mistrial motion.

## II.

### Heat of Passion Voluntary Manslaughter Instruction

Welch argues the trial court erred by failing to instruct on the lesser included offense of voluntary manslaughter based on heat of passion.

When there is substantial evidence showing a defendant committed a lesser included offense, the trial court has a duty to instruct the jury on it. (*People v. Cook* (2006) 39 Cal.4th 566, 596 (*Cook*).) Specifically, "[t]he court must, on its own initiative, instruct the jury on lesser included offenses when there is substantial evidence raising a question as to whether all the elements of a charged offense are present [citations], and when there is substantial evidence that the defendant committed the lesser included offense, which, if accepted by the trier of fact, would exculpate the defendant

20

from guilt of the greater offense." (*Ibid.*) We review de novo the trial court's failure to instruct on a lesser included offense. (*Ibid.*; *People v. Vasquez* (2018) 30 Cal.App.5th 786, 793.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Voluntary manslaughter and involuntary manslaughter are both lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) "The lesser included offense of manslaughter does not include the element of malice, which distinguishes it from the greater offense of murder. [Citation.]" (*Cook, supra,* 39 Cal.4th at p. 596.)

"When a homicide, committed with malice, is accomplished in the heat of passion or under the good faith but unreasonable belief that deadly force is required to defend oneself from imminent harm, the malice element is 'negated' or . . . 'mitigated'; and the resulting crime is voluntary manslaughter, a lesser included offense of murder. [Citations.]" (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).)

Welch contends a voluntary manslaughter instruction was warranted based on his statements, both at trial and to law enforcement, that Mario approached his car in an aggressive manner. Welch claims Mario walked up aggressively and said, "What the f!" and he feared Mario was going to get in his car. He said his anxiety increased after he pointed his gun at Mario and, in response, Mario laughed and moved his arm so Welch could no longer see it. Welch contends these acts, which he describes as provocative, induced fear and caused him to react reflexively and fire at Mario.

In our view, Welch's argument on appeal is based on too selective a reading of the record, which does not reveal substantial evidence that Welch acted under the heat of passion. "Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been

21

sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*).) "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' " (*People v. Moye* (2009) 47 Cal.4th 537, 550.)

In this case, there is insufficient evidence to support either the objective or subjective components. Two witnesses, Valerie and R.H., observed the very brief interaction between Welch and Mario and neither described Mario's behavior as aggressive. Both said Mario did not have anything in his hands, belying any suggestion he was armed. Thus, the evidence did not show any objective basis for concluding an ordinary person of average disposition would be sufficiently provoked by Mario's behavior. (*Enraca, supra*, 53 Cal.4th at p. 759.)

And, as discussed *ante*, Welch undercut his own testimony that he subjectively felt provoked. He told officers that he was going to shoot Mario, then decided not to, then changed his mind after Mario laughed at him. Although the passion aroused "can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 163), Welch does not direct us to any authority suggesting that laughter constitutes sufficient provocation. We think the opposite is true given that, on analogous facts, our high court has repeatedly "rejected arguments that

insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter." (*Enraca*, *supra*, 53 Cal.4th at p. 759.) Furthermore, in suggesting he became fearful that Mario might have a weapon when Mario's arm moved out of view, Welch ignores his prior statement to police that Mario never threatened him with whatever he had in his hand. He also told officers he shot Mario not out of fear, but "[b]ecause something was telling me to."

Ultimately, Welch's self-serving testimony at trial is the only evidence that he acted reflexively out of fear, but even that description does not support the conclusion that Mario's actions caused Welch's reason to be "obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' " (*Moye*, *supra*, 47 Cal.4th at p. 550.) He testified that right after asking each other if they knew the other, he interpreted Mario's tone and body language as aggressive and said he did not know what Mario was going to do. But this evidence of provocation is minimal, at best, and "[s]peculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon* (2016) 1 Cal.5th 98, 132; see also *Breverman*, *supra*, 19 Cal.4th at p. 162 [explaining that "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense"].) Regardless, even if he demonstrated substantial evidence to satisfy the subjective prong, evidence of the objective component is lacking, and both are required. (*Enraca*, *supra*, 53 Cal.4th at p. 759.)

23

Accordingly, we conclude Welch has not shown there was substantial evidence in the record justifying a voluntary manslaughter instruction on a theory of heat of passion. The trial court, therefore, did not err by not giving one.

## III.

## Prosecutorial Misconduct

Welch next contends the prosecutor committed misconduct in questioning him about his telephone call with his mother and their discussion of a published legal opinion. Because the case Welch read related to diminished capacity and other mental health defenses, and the implication was that the case was given to him by his trial counsel, Welch contends the prosecutor's questions sought the disclosure of attorney work product. Welch asserts that this misconduct violated his state and federal constitutional rights to due process and counsel.

A. *Additional Facts*

During cross-examination, the prosecutor questioned Welch about a certain opinion he had read regarding the defenses of diminished capacity, voluntary intoxication, and insanity. Welch acknowledged he was given the case to read, although he did not say by whom, and said he had read it five times. The prosecutor then asked if he had told his mother about the case during a monitored telephone call from jail, and Welch confirmed that he had. Defense counsel objected to this line of questioning on relevance grounds, but the court overruled the objection.

The prosecutor then went on to ask Welch whether the purpose of him reading this appellate opinion was to prepare him to give evidence to support an insanity or a voluntary intoxication defense. After a few more questions regarding why Welch was reading the case, defense counsel asked to

24

approach the bench and objected that the questioning was intruding upon attorney-client communication. The court said there was nothing wrong with the prosecution creating an inference, and the prosecutor clarified that he had been careful not to say who provided the case to Welch. He also explained that he only knew about it because Welch had told his mother about reading it during a call from the jail, thereby waiving attorney-client privilege. With this additional information, defense counsel withdrew her objection.

Sometime later, the prosecutor returned to the subject of the appellate opinion, and defense counsel objected to the prosecution's characterization of the opinion. The court overruled the objection, and the prosecutor again elicited testimony that Welch had discussed reading the case with his mother, although he denied referring to diminished capacity in speaking with her. The prosecutor then played a recording of the call. Thereafter, Welch acknowledged he had mentioned diminished capacity during the telephone conversation.

B. *Analysis*

The People assert that Welch forfeited this claim by failing to object on prosecutorial misconduct grounds below. We agree.

" ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 426.) There is no question Welch's counsel did not object on misconduct grounds below or seek an admonition, and Welch

concedes as much.[9]  Nonetheless, he argues the failure should be excused because the misconduct was so egregious that admonition of the jury would not have cured the harm done.  In other words, Welch submits that it would be impossible to expect the jurors to ignore what they had heard.

It is not clear why this would be true.  During trial, the prosecutor began by eliciting Welch's admission that his goal in testifying was to get the jury to find him not guilty of the serious charges he was facing, and that one of the ways he hoped to do so was by presenting evidence supporting a diminished capacity, voluntary intoxication, or insanity defense.  Only then did the prosecutor say, "And I'm using these terms because they come from a specific case that you had the opportunity to review, right?" to which Welch responded, "Probably not."  Had defense counsel lodged a prosecutorial misconduct objection at this point, resulting in an admonition to the jury, the prosecutor would have stopped his line of questioning and the lingering inference, at worst, would have been that his counsel gave him a case explaining the defenses Welch had already admitted he sought to pursue.  And, even if the jury was unable to ignore this inference, Welch did, in fact, then offer testimony from a toxicologist and a psychologist that he was intoxicated by methamphetamine at the time of the crime and had various mental health diagnoses.  Under these circumstances, Welch has not demonstrated that the harm overrode the forfeiture.

---

[9]     Welch also points out that the purpose of the forfeiture doctrine is to ensure parties provide the trial court with an opportunity to address issues in the first instance.  He argues his counsel did so by raising attorney-client privilege concerns during a sidebar.  However, counsel did not ever mention attorney work-product during these discussions and, therefore, did not afford the trial court an opportunity to resolve the issue.

Welch further argues the failure to object and request an admonition should be excused because his due process right to a fair trial and right to counsel are at stake. However, although appellate courts have discretion to review a forfeited claim, particularly when the claim involves an important issue of constitutional law or a substantial right (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7 (*Sheena K.*)), the California Supreme Court has made clear that "there is no constitutional basis for a work product privilege." (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 381, fn. 18 ["find[ing] untenable the proposition that the work product doctrine, created by the Supreme Court in a *civil* case, is in actuality founded in the right to counsel clause applicable only to *criminal* defendants"].) Nevertheless, Welch's claim also fails on the merits.

As an initial matter, it is not at all clear that attorney work product was at issue in this situation. The parties initially dispute whether the definition of work product in this context should be limited to the "core" work product ordinarily protected in criminal cases, i.e., to any "writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories." (§ 1054.6 [limiting work product protection to the definition provided in Code of Civil Procedure § 2018.030, subdivision (a)]; *People v. Zamudio* (2008) 43 Cal.4th 327, 354–355.) But regardless of which definition is applied, what Welch objects to is the fact that the questioning revealed the defense's trial strategy, which was not set forth in the appellate opinion itself. There also is no indication the opinion contained any attorney notes or highlighting evincing the attorney's thoughts or theories of the case. Although the *act* of the attorney giving the case to her client to read could itself be protected, this protection would arise under the attorney-client

27

privilege, not work product. As our high court explained in *Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 600, the attorney-client privilege "covers the transmission of documents which are available to the public, and not merely information in the sole possession of the attorney or client. In this regard, it is the actual fact of the transmission which merits protection, since discovery of the transmission of specific public documents might very well reveal the transmitter's intended strategy."

Even assuming work product protections were implicated, we conclude Welch waived them by disclosing the material and the basis for his review of it on a monitored jail line. Just like the attorney-client privilege, work product protection can be waived. (*Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 214; *OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 891.) The fact that he disclosed it to his mother, who may herself have had an interest in maintaining the confidentiality, did not necessarily waive protection. (See *Citizens for Ceres v. Superior Court* (2013) 217 Cal.App.4th 889, 914–917 [explaining that the common interest doctrine, which is based on Evidence Code sections 912 and 952, provides that disclosure to third parties does not waive work product protection if the parties' common interests are aligned and disclosures between them is reasonably necessary to accomplish the purposes for which they are consulting counsel]; *OXY*, at p. 891.) But this is immaterial because Welch had no expectation of privacy when making a phone call to a non-attorney from a jail phone, and the interests of anyone monitoring a jail phone would most definitely not be aligned with Welch's.

Welch argues he did not waive protection because he did not disclose "a significant part of the communication" (Evid. Code, § 912, subd. (a)) to his

mother.  However, given that Welch's ultimate objection is to the prosecutor's attempt to inquire into attorney work product in the form of counsel's theory of the case as conveyed via a legal opinion provided to her client, it is difficult to imagine what else would be significant other than the fact that she gave him the case and he closely scrutinized the mental capacity defenses described therein.

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.'  [Citations.]  In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'  [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'  [Citations.]"  (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)  We will not reverse a conviction for prosecutorial misconduct "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct."  (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Here, because we conclude Welch waived any work product protection that may have arisen from his attorney's provision of the appellate opinion to him, the prosecutor did not engage in "deceptive or reprehensible methods" or other misconduct by inquiring about the case and Welch's discussion with his mother.  Nor did he do so when, before he even referenced the case or the conversation with Welch's mother, he elicited an admission that Welch hoped to get the jury to find him not guilty by presenting evidence of a diminished capacity defense.  Therefore, we conclude the prosecution's actions did not interfere with Welch's right to counsel or deprive him of a fair trial.

IV.

Constitutionality of the "Shooting from a Motor Vehicle"
Special Circumstance

Welch challenges the constitutional validity of section 190.2, subdivision (a)(21), otherwise known as the "shooting from a motor vehicle" special circumstance for murder, as overinclusive on its face and as applied in this case.[10] In particular, he argues the provision violates substantive due process because it reaches conduct that does not rationally relate to the purpose of the statutory provision and it is overinclusive. He further argues it runs afoul of the Eighth Amendment because it includes conduct such as spontaneous and unpremeditated murder that does not warrant eligibility for death or life imprisonment without the possibility of parole. In his view, section 190.2, subdivision (a)(21) penalizes a factual characteristic of an offense, being in a vehicle, which is not necessarily related to culpability, resulting in more severe punishment for what might otherwise be treated as second-degree murder.

---

[10] The shooting from a motor vehicle special circumstance provides:

"(a) The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true:

[¶] . . . [¶]

"(21) The murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person or persons outside the vehicle with the intent to inflict death. For purposes of this paragraph, 'motor vehicle' means any vehicle as defined in Section 415 of the Vehicle Code." (§ 190.2, subd. (a)(21).)

He also challenges this special circumstance as unconstitutionally vague because it fails to distinguish between a shooting from a vehicle that results in first degree murder (§ 189) and the type of discharge of a firearm from a vehicle that qualifies a defendant for death or life without the possibility of parole, thereby risking arbitrary and prejudicial enforcement.

A.    *Forfeiture*

Welch did not challenge the shooting from a motor vehicle special circumstance (§ 190.2, subd. (a)(21)) in the trial court.  Ordinarily, a defendant who does not raise a claim in the trial court forfeits his or her right to assert the claim on appeal.  (*Sheena K.*, *supra*, 40 Cal.4th at pp. 880–881.)  An exception to the rule, however, allows consideration of a defendant's assertion that a statute is facially unconstitutional as a purely legal issue that does not require review of the trial record.  (*Id*. at p. 889; *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9 ["Notwithstanding this rule of forfeiture, courts generally consider constitutional challenges to penal statutes for the first time on appeal where, as here, the arguments are legal, based on undisputed evidence, and center on review of abstract and generalized legal concepts"].)  Accordingly, we will consider only his facial challenges to the constitutionality of section 190.2, subdivision (a)(21), as failure to object forfeits any as-applied challenge.  (*Sheena K.*, at pp. 887–889.)

B. *Overbreadth*

Welch contends the shooting from a motor vehicle special circumstance is overinclusive and unconstitutional under the due process clause of the Fourteenth Amendment and the cruel and unusual punishment clause of the Eighth Amendment.

31

To prevail in a facial challenge, the appellant " 'must establish that no set of circumstances exists under which the [regulation] would be valid.' " (*Reno v. Flores* (1993) 507 U.S. 292, 301 (*Reno*); see also *New York v. Ferber* (1982) 458 U.S. 747, 768 [explaining that this "practice also fulfills a valuable institutional purpose:  it allows state courts the opportunity to construe a law to avoid constitutional infirmities"].)  As a result, "[a] facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully." (*United States v. Salerno* (1987) 481 U.S. 739, 745.)  Additionally, the fact that an act "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."  (*Ibid.*; see also *United States v. Hansen* (2023) 599 U.S. 762, 769–770 [143 S.Ct. 1932, 1939-1940] [continuing to recognize the overbreadth doctrine as applicable only to statutes impinging upon free speech]; *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 169 (*Rodriguez*) ["this 'overbreadth doctrine' is applicable primarily (if not exclusively) only when First Amendment rights are implicated"].)

Given that Welch is not challenging section 190.2, subdivision (a)(21) on First Amendment grounds, we find no support for his overbreadth argument.  Furthermore, he states that he "is not asking this court to second-guess the wisdom of creating a shooting from a motor vehicle special circumstance."  Rather, his concern is "with the manner in which the language of the provision will inevitably be applied to reach conduct beyond the evil sought to be remedied."  These statements imply that the statute *is* constitutionally applied in some circumstances, which defeats his facial challenge.  (*Reno*, *supra*, 507 U.S. at p. 301.)  The fact that he focuses on the overbreadth of the statute further reflects his acknowledgement that there

are circumstances under which the regulation would be valid. (See *Rodriguez*, *supra*, 66 Cal.App.4th at p. 172 ["Stating that a statute is merely 'overinclusive,' however, presupposes that parts of the statutory coverage have been properly included"].) Accordingly, Welch has not met his burden of demonstrating that section 190.2, subdivision (a)(21) is unconstitutionally overbroad.

## C. *Vagueness*

Alternatively, Welch mounts a facial attack on section 190.2, subdivision (a)(21) on the grounds that it is unconstitutionally vague. He contends section 190.2, subdivision (a)(21) is impermissibly vague because it fails to distinguish between a shooting from a vehicle that results in a first degree murder conviction (§ 189)[11] subject to a sentence *with* the possibility of parole, and the type of discharge of a firearm from a vehicle that qualifies a defendant for death or life *without* the possibility of parole. Absent any meaningful distinction between the criteria necessary to satisfy the two statutes, Welch argues the special circumstance statute risks arbitrary and prejudicial imposition of death or life without the possibility of parole.

---

[11] Section 189 provides: "(a) All murder that is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or that is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 287, 288, or 289, or former Section 288a, or murder that is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." (§ 189, subd. (a).)

33

Imprecise laws can be attacked on their face as overbroad or vague. (*City of Chicago v. Morales* (1999) 527 U.S. 41, 52.) A criminal statute may be so impermissibly vague as to violate due process guarantees if it "fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." (*Johnson v. United States* (2015) 576 U.S. 591, 595–596; *In re N.R.* (2023) 15 Cal.5th 520, 554 [" 'The vagueness doctrine bars enforcement of " 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " ' "].)

In *Furman v. Georgia* (1972) 408 U.S. 238, the Supreme Court addressed the latter concern in relation to the death penalty. In so doing, the Court "recognize[d] that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice" and, for this reason, it held that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." (*Gregg v. Georgia* (1976) 428 U.S. 153, 188.) Accordingly, any legislative scheme that prescribes the death penalty "must include some narrowing principle that channels jury discretion and provides a principled way to distinguish those cases in which the death penalty is imposed from the many cases in which it is not." (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 462; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 972 [a death penalty law may not apply to every defendant convicted of a murder].) When a death-eligibility criterion does not meet that standard, it is considered impermissibly vague. (*Bacigalupo*, at p. 462.)

The California Supreme Court has previously considered and rejected numerous challenges to the constitutionality of California's death penalty law

and has repeatedly declined to reconsider its prior rulings. (See, e.g., *People v. Thomas* (2023) 14 Cal.5th 327, 408; *People v. Scully* (2021) 11 Cal.5th 542, 610; *People v. Schultz* (2020) 10 Cal.5th 623, 682.) The high court recently concluded that "[s]ection 190.2, which sets forth the special circumstances that render those convicted of murder death eligible, adequately narrows the class of those eligible for the death penalty and is not impermissibly broad in violation of the Eighth and Fourteenth Amendments." (*Scully*, at p. 610.) Moreover, our Supreme Court has concluded that "first degree murder liability and special circumstances findings may be based upon common elements without offending the Eighth Amendment. [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 158.) Accordingly, we are not persuaded by Welch's argument that the drive-by special circumstance is constitutionally infirm solely because the elements are the same as those required to find a defendant guilty of first degree murder.

Contrary to Welch's selective reading of the opinion, we did not conclude otherwise in rejecting a similar vagueness challenge to the felony-murder special circumstance in *People v. Andreasen* (2013) 214 Cal.App.4th 70 (*Andreasen*). That case involved a fatal stabbing in a parking lot resulting in a judgment convicting Andreasen of first degree murder, with a special circumstance finding of murder during the commission of the attempted robbery. (*Id.* at pp. 73–74.) Andreasen was sentenced to life without the possibility of parole. (*Id.* at p. 79.) On appeal, Andreasen argued the special circumstance enhancement was unconstitutionally vague because, "as applied to the actual perpetrator of the killing (who need not have the intent to kill), the special circumstance [was] indistinguishable from the felony-murder offense, which imposes a life sentence *with* the possibility of parole when there is no special circumstance finding." (*Ibid.*) As a result, he

35

"posit[ed] this create[d] a constitutional infirmity because the prosecutor had 'unfettered discretion' to select the charge, and defendant had no way of anticipating whether he would be subjected to the possibility of death or life in prison without the possibility of parole, rather than life with the possibility of parole." (*Ibid.*)

Although Welch suggests we rejected the vagueness challenge only because we were able to draw a distinction between the special circumstance and the murder statute, that is not the case. Rather, what we concluded was that the statutes "provided [the] defendant with notice that if he commits a statutorily specified felony and kills someone during that felony, he could be subjected to a sentence of 25 years to life with the possibility of parole, life without parole, or death. [The d]efendant had notice as to the proscribed conduct and potential punishment. The mere fact that the prosecution has discretion to select which punishment it will seek does not render a statute unconstitutionally vague or create an improper risk of arbitrary enforcement of a criminal statute." (*Andreasen, supra*, 214 Cal.App.4th at p. 80.) Only then did we go on to explain that, "even *assuming arguendo* that constitutional due process requires a distinction between the felony-murder offense and the felony-murder special circumstance [citations], there is such a distinction." (*Ibid.*, italics added.) That distinction was that "the felony-murder offense is established merely upon a showing that the defendant killed during the commission or attempted commission of the felony, whereas the felony-murder special circumstance requires an additional showing that the intent to commit the felony was independent of the killing." (*Ibid.*) Accordingly, we did not then, and we do not now, conclude we must draw a distinction between the statutes in order to overcome a vagueness challenge.

36

V.

Firearm Discharge Enhancements

After finding Welch guilty on counts 1 through 4, the jury found true allegations as to each count that he personally and intentionally discharged a firearm causing death or great bodily injury pursuant to section 12022.53, subdivision (d). The court sentenced him to 25 years to life for each of these enhancements. Welch contends the court gave no indication it was aware of its newly granted authority to strike some of the firearm enhancements under amended section 1385, subdivision (c). On appeal, Welch argues the trial court was required to dismiss three of the four section 12022.53, subdivision (d) enhancements pursuant to section 1385, subdivision (c)(2)(B).

A. *Forfeiture*

The People contend Welch forfeited this claim by failing to object during sentencing. Although Welch acknowledges his failure to object below to the imposition of all four enhancement sentences, he insists the forfeiture doctrine does not apply because the sentence is legally unauthorized.

As our high court confirmed in *People v. Scott* (1994) 9 Cal.4th 331, a party may forfeit or waive "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" by failing to object below. (*Id.* at p. 353.) However, this rule does not apply when the sentence is legally unauthorized. (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751.) In this case, because Welch argues that section 1385, subdivision (c)(2)(B) removes the trial court's authority to exercise its discretion at all in deciding whether to strike additional enhancements, we cannot definitively state that this rule of forfeiture applies without addressing the merits of his claim. Accordingly, we decline to decide the issue on forfeiture grounds despite Welch's failure to object below.

37

B.  *Analysis*

Because Welch's argument hinges on the proper construction of section 1385, we review his claim de novo.  (*John v. Superior Court* (2016) 63 Cal.4th 91, 95.)

Section 1385 has long permitted trial courts to dismiss sentence enhancements, or the additional punishment associated with such enhancements, if doing so is in furtherance of justice.  (See former § 1385, amended by Stats. 1986, ch. 85, § 2, eff. May 6, 1986.)  In October 2021, the Governor signed Senate Bill No. 81 (Senate Bill 81) that added a new subdivision (c) to section 1385.  Under this new subdivision, trial courts:

> " . . . shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

> "(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.  'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.

> [¶] . . . [¶]

38

"(B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed."[12]

Because Senate Bill 81 by its express terms "appl[ies] to all sentencings occurring after January 1, 2022" (§ 1385, subd. (c)(7)), it was in effect when Welch was sentenced on August 26, 2022.

Welch contends the trial court's sentence in this case violates current section 1385, subdivision (c)(2)(B) because the use of the word "shall" mandates the dismissal of all but one enhancement. In asserting this contention, he acknowledges that recent cases have uniformly rejected similar arguments after considering the totality of the statutory language. (See *People v. Mendoza* (2023) 88 Cal.App.5th 287, 290–293 (*Mendoza*); *People v. Anderson* (2023) 88 Cal.App.5th 233, 238–240, review granted Apr. 19, 2023, S278786 (*Anderson*); *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15–21 (*Lipscomb*); *People v. Walker* (2022) 86 Cal.App.5th 386, 395–398, review granted Mar. 22, 2023, S278309 (*Walker*).)

In *Walker*, the court considered whether section 1385, subdivision (c)(2)(B) mandates the dismissal of all but one sentencing enhancement in all cases. (*Walker, supra,* 86 Cal.App.5th at p. 396, review granted.) The appellate court determined that it did not and explained, "the text and purpose of section 1385 in general, and Senate Bill No. 81 in particular, as well as the canons of statutory construction, counsel in favor of

---

[12] Section 1385, subdivision (c)(2)(C) lists an additional factor containing the same mandatory language as subdivision (c)(2)(B), namely: "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed." (§ 1385, subd. (c)(2)(C).) Although Welch does not directly rely on this additional mitigating factor, many of the opinions discussed *post* jointly or separately address this provision because it contains the same "shall be dismissed" language.

concluding that the [relevant statutory language] does not obligate trial courts to automatically dismiss all but one enhancement." (*Walker*, at p. 396.) "The phrase 'all enhancements beyond a single enhancement shall be dismissed' is not a standalone mandate of section 1385," but rather one of nine mitigating circumstances. (*Id.* at p. 397.) Further, the court noted that "[s]ection 1385 explicitly instructs that the existence of a mitigating circumstance—including the one for '[m]ultiple enhancements'—'weighs greatly in favor of dismiss[al]' " but, under the remaining statutory language, the trial court retains its discretion "to evaluate whether dismissal is in the furtherance of justice by weighing enumerated and unenumerated mitigating factors against whether dismissal of an enhancement would 'endanger public safety.' " (*Ibid.*, italics omitted.)

The court therefore concluded that section 1385, subdivision (c)(2)(B) "means what it says—namely, that if a trial court determines that the mitigating circumstance of '[m]ultiple enhancements . . . in a single case' exists and that dismissal of the enhancements will not 'endanger public safety,' then the court's discretion to dismiss is somewhat constrained by the phrase's mandate that the court must dismiss all but one of those multiple enhancements." (*Walker*, *supra*, 86 Cal.App.5th at p. 397, review granted.) Additionally, the court determined that "section 1385's use of the additional phrase 'great weight' " "erects a presumption in favor of the dismissal of the enhancement unless and until the court finds that the dismissal would

40

'endanger public safety' as that term is defined in section 1385." (*Id.* at pp. 398–399.)[13]

The court in *Lipscomb* addressed essentially the same issue in the context of section 1385, subdivision (c)(2)(C). There, the trial court had declined to dismiss a section 12022.53, subdivision (d) enhancement—which resulted in imposition of an additional term of 25 years to life—based on a finding that dismissal " 'would result in physical injury or serious danger to others.' " (*Lipscomb*, *supra*, 87 Cal.App.5th at p. 13.) The defendant asserted the dismissal was mandatory based on the "shall be dismissed" language in section 1385, subdivision (c)(2)(C), but, as in *Walker*, the appellate court concluded subdivision (c)(2)(C) did not compel dismissal in all cases. (*Lipscomb*, at p. 21.) Rather, the court explained that the full language of the statute, read in context, "expressly empower[s] the [trial] court to impose the enhancement upon a finding that dismissing it would endanger public safety." (*Id.* at p. 19.)

In *People v. Ortiz* (2023) 87 Cal.App.5th 1087, review granted April 12, 2023, S278894 (*Ortiz*), the court declined to follow *Walker* to the extent it would "require the trial court to dismiss an enhancement absent a finding that dismissal would endanger public safety" because to do so "would divest the trial court of its ultimate discretion under the statute to determine what is in furtherance of justice, considering all relevant factors." (*Id.* at

[13] As noted, the California Supreme Court granted a petition for review in *Walker*. Our high court specified that its review "is limited to the following: Does the amendment to Penal Code section 1385, subdivision (c) that requires trial courts to 'afford great weight' to enumerated mitigating circumstances (Stats. 2021, ch. 721) create a rebuttable presumption in favor of dismissing an enhancement unless the trial court finds dismissal would endanger public safety?" (*People v. Walker*, order granting review issued March 22, 2023, S278309.)

p. 1098.) Such factors under " 'generally applicable sentencing principles' relevant to a court's determination of whether dismissal is in furtherance of justice 'relat[e] to matters such as the defendant's background, character, and prospects.' " (*Id.* at p. 1097 quoting *People v. Williams* (1998) 17 Cal.4th 148, 160.) "Those principles require consideration of circumstances in mitigation (and aggravation) in the broader context of the recognized objectives of sentencing, which are not limited to public safety." (*Ortiz*, at p. 1097 citing Cal. Rules of Court, rule 4.410).)

The People urge us to follow the reasoning of *Ortiz*. However, the *Ortiz* decision addressed two different circumstances in mitigation: section 1385, subdivision (c)(2)(D) (a current offense connected to mental illness) and (F) (a current offense that is not a violent felony). (*Ortiz*, *supra*, 87 Cal.App.5th at p. 1094, review granted.) In rejecting the *Walker* court's rebuttable presumption approach, the *Ortiz* court expressly noted that "a 'connect[ion] to mental illness' does not, as a practical matter, lend itself to the one-size-fits-all formalism of a presumption that may only be overcome by a danger to public safety." (*Id.* at p. 1097.) But, in so doing, it expressly distinguished this mitigating circumstance from those "[a]t the other end of the spectrum," such as section 1385, subdivision (c)(2)(B) and (C) wherein "the Legislature has unambiguously provided that the operative enhancement(s) 'shall be dismissed.' " (*Id.* at p. 1097, fn. 6.) It explained that these circumstances "are unlike the other seven listed in that they are not mitigating in any conventional sense—as to either the nature and circumstances of the current offense or the defendant's 'background, character, and prospects' [Citation]— but only by operation of law.' " (*Ibid.*) This suggests that, if called upon to interpret the language of section 1385, subdivision (c)(2)(B) and (C), the *Ortiz*

42

court might limit discretion only to a consideration of whether dismissal of the enhancements would endanger public safety.

Subsequently, the *Anderson* court adopted somewhat of an amalgam approach, concluding: "It is within these boundaries that section 1385 states the court 'shall' dismiss all but one enhancement and/or enhancements resulting in a sentence of more than 20 years. The dismissal *shall* occur but only *if,* in exercising its discretion and giving great weight to certain factors, the court finds dismissal is in the interests of justice *or* would not endanger public safety." (*Anderson, supra,* 88 Cal.App.5th at pp. 239–240, review granted, italics added.)

In the most recent decision related to this issue, the *Mendoza* court determined that, if the trial court found that dismissal of the enhancement would endanger public safety, it need not go on to consider the mitigating factors. (*Mendoza, supra,* 88 Cal.App.5th at p. 297.) And, because the trial court in that case expressly found such endangerment present, the *Mendoza* court concluded it did not need to analyze how the "shall be dismissed" language of section 1385, subdivision (c)(2)(C) operates when a trial court finds that dismissal of a firearm enhancement would *not* endanger public safety. (*Mendoza,* at p. 297.)

The one point on which every single one of these decisions agree is that, despite the "shall be dismissed" language of section 1385, subdivision (c)(2)(B) and (C), the trial court retains discretion over the decision to strike enhancements at sentencing. Absent further instruction from our high court, we decline to find otherwise. Rather, we are persuaded by the multitude of published cases concluding that section 1385, subdivision (c)(2)(B) requires dismissal of a sentencing enhancement only where the trial court concludes dismissal would not be in the furtherance of

43

justice and/or would endanger public safety.[14] (§ 1385, subd. (c)(2).)

Accordingly, we reject Welch's claim that the trial court erred.[15]

We are not persuaded otherwise by Welch's argument that trial courts already had discretion to dismiss enhancements in furtherance of justice and, thus, Senate Bill 81 should be read to *require* courts to do something that they previously only had discretion to do. Stated differently, Welch's point is that the Legislature ordinarily enacts a new statute to change something, not to authorize it for a second time.

We disagree that Senate Bill 81 simply reauthorized trial courts to exercise their existing discretion. Instead, this sentencing statute, like many others, enumerates specific practices the Legislature finds objectionable and which grounds for large sentences it would like to discourage. It puts these issues on the sentencing judge's radar and seeks to "fine tune how a court is to exercise that discretion." (*Walker*, *supra*, 86 Cal.App.5th at p. 395, review granted.) As the *Walker* court stated, it may even, "place[ ] a thumb on the scale that balances the mitigating circumstances favoring dismissal against whether dismissal would endanger public safety." (*Id.* at pp. 399–400.) But

---

[14] Because Welch does not argue in the alternative that the trial court abused its discretion in refusing to dismiss three of the four enhancements, we need not decide which court's construction of the statute to adopt, nor must we evaluate the trial court's justification for the sentence in this case.

[15] Anticipating the People's forfeiture arguments, Welch argued that, should we conclude he forfeited his prosecutorial misconduct or firearm enhancement sentencing claims, we alternately should find his attorney provided constitutionally inadequate assistance of counsel. Because we addressed both claims on the merits, we need not address his ineffective assistance of counsel arguments.

44

it does not remove the judge's discretion to determine what sentence is appropriate in light of the specific facts presented in the case.

Welch's argument that we must interpret statutory language as written also does not alter our analysis. " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' " (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 14 (*Skidgel*).) " 'We begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. [Citation.] We must harmonize the various parts of the enactments by considering them in the context of the statutory [framework] as a whole. [Citation.] If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.' " (*Ibid.*)

As other courts have observed, reading the "shall be dismissed" language as mandatory requires us to consider it in isolation. (See, e.g., *Walker, supra*, 86 Cal.App.5th at p. 397, review granted [commenting that "[i]f we were to read the phrase appended to the multiple enhancements mitigating factor as *automatically* mandating dismissal of all but one enhancement whenever multiple enhancements exist, then the existence of multiple enhancements would not 'weigh greatly' in favor of dismissal—it would weigh *dispositively*' "].) Further, such a construction violates the

45

direction to " 'harmonize the various parts of the enactments.' " (*Skidgel*, *supra*, 12 Cal.5th at p. 14.) If a trial court was required to dismiss all enhancements beyond a single enhancement in all cases, the language regarding the court's "discretion," proof of the multiple enhancements "weigh[ing] greatly," and the court's authority to consider whether "dismissal of the enhancement would endanger public safety" would all be rendered meaningless. Precedent has long made clear that " '[a] construction making some words surplusage is to be avoided.' "[16] (*People v. Valencia* (2017) 3 Cal.5th 347, 357.)

Finally, we are not persuaded by Welch's argument that subsequent legislative actions wherein the Legislature declined to remove the "shall be dismissed" language demonstrate its intent to make said language mandatory. Under Senate Bill 81, the mitigating circumstance of more than one enhancement was contained in section 1385, subdivision (c)(3), which provided that "While the court may exercise its discretion at sentencing, nothing in this subdivision shall prevent a court from exercising its discretion before, during, or after trial or entry of plea." Assembly Bill 200 (Stats. 2022, ch. 58) amended section 1385 effective June 30, 2022 to delete subdivision (c)(3) and move the nine mitigating circumstances under the umbrella of subdivision (c)(2). But as both subdivisions explicitly reference the court exercising its discretion, this legislative action does not support

---

[16] We further note that construing section 1385, subdivision (c)(2)(B) as remaining subject to the trial court's discretion also harmonizes this statute with section 12022.53, under which the enhancements were imposed. This section provides, "The court *may, in the interest of justice* pursuant to Section 1385 . . . strike or dismiss an enhancement otherwise required to be imposed by this section" (§ 12022.53, subd. (h), italics added). In other words, it too affords the trial court discretion to dismiss enhancements.

Welch's argument that the Legislature did not intend the courts to have any discretion at all.

The same is true with regard to Welch's contention regarding the failed passage of Assembly Bill No. 931 (2021-2022 Reg. Sess.), which would have removed the requirement to dismiss enhancements when multiple enhancements were present. Contrary to Welch's selective reading of the bill text's description of existing law, it too couched the language within the framework of the trial court's *discretion* to dismiss enhancements.[17] (See *People v. Cota* (2023) 97 Cal.App.5th 318, 428 [concluding "the Legislature's failure to pass Assembly Bill No. 931 is not evidence that the Legislature intended section 1385, subdivision (c)(2)(B) to mandate dismissal of any enhancement"].)

---

[17] Assembly Bill No. 931 provided, "Existing law requires a court, *in exercising its discretion* to dismiss an enhancement, to consider and afford great weight to evidence offered by the defendant to prove that specified mitigating circumstances exist, including the allegation of multiple enhancements in a single case and that the application of an enhancement could result in a sentence of over 20 years. Existing law requires the dismissal of all enhancements beyond a single enhancement and the dismissal of all enhancements when the resulting sentence is over 20 years." (Italics added.)

47

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

KELETY, J.

CASTILLO, J.